1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ABC DISTRIBUTING, INC., et al.,

Plaintiffs,

v.

LIVING ESSENTIALS LLC, et al.,

Defendants.

Case No. 15-cv-02064-NC

**ORDER DENYING PARTIES' MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 218, 219, 224, 228, 229

In this price discrimination case, several wholesaler plaintiffs allege that defendants Living Essentials LLC and Innovation Ventures LLC sold the dietary supplement 5-hour Energy to Costco Wholesale Corp. at a lower price than they offered to Plaintiffs. Plaintiffs' claims arise from Sections 2(a) and 2(d) of the federal Robinson-Patman Act, which proscribes price discrimination that is likely to have an anticompetitive effect. Plaintiffs' fundamental burden is to show that Living Essentials charged Plaintiffs a higher price for 5-hour Energy than it charged to Costco, and that the price discrimination could be harmful to competition.

To show the requisite competitive injury, Plaintiffs must demonstrate that they actually competed with Costco for 5-hour Energy sales and that they experienced substantial price discrimination over a significant period of time. Plaintiffs' best evidence to that end is a set of statements by employees of Living Essentials and its broker, Paramount Sales Group. Those employees express their concern that promotional pricing

given to Costco has negatively affected 5-hour Energy sales to and by wholesale distributors in California.

Relying primarily on these statements, Plaintiffs now move for partial summary judgment on their RPA and related state law claims, leaving out the damages amount. Living Essentials moves for summary judgment on all of Plaintiffs' claims. Fatal to Plaintiffs' motion, the evidence on record leaves open a genuine factual dispute whether Plaintiffs actually competed with Costco for 5-hour Energy sales. Conversely, Plaintiffs offer sufficient evidence of actual competition, discriminatory pricing, and anticompetitive effect to thwart Living Essentials' motion. Accordingly, both parties' motions for summary judgment are DENIED.

## I. BACKGROUND

### A. Facts Presented

The following facts are undisputed, except where noted.

Plaintiffs ABC Distributing, Inc., Elite Wholesale, Inc., and Tonic Wholesale, Inc. dba Ace Wholesale are small wholesale distribution corporations with their principal place of business in Los Angeles, California. While all three plaintiffs sell general merchandise to small shops and convenience stores, ABC is primarily a tobacco business and promotes its own brand of cigars, called "Splitarillos." ABC offers delivery to its customers. Elite and Ace do not offer delivery, so their customers tend to be nearby grocery and convenience stores. During the relevant time period, between May 7, 2011 and when this action was filed, Elite handled Ace's 5-hour Energy sales; Ace never purchased the product for itself.

Defendants Living Essentials LLC and its parent company Innovation Ventures LLC (collectively, "Living Essentials") have their principal place of business in Michigan. Living Essentials manufactures and distributes 5-hour Energy, a popular dietary supplement. 5-hour Energy is sold as a liquid 1.93-ounce bottle, and all bottles that Living Essentials sold were of like grade and quality. From 2011 to when this action was filed in 2015, Living Essentials sold 5-hour Energy to California wholesalers, including Plaintiffs,

through Paramount Sales Group, a commissioned, third-party broker.

During the relevant time period, third party Costco Wholesale Corp. operated four Costco Business Centers (CBCs) located in California, including two in Los Angeles. The parties dispute the exact nature of Costco's role in the supply chain. Plaintiffs assert Costco is a "convenience store wholesaler" ("C-store wholesaler"), on par with Plaintiffs. Living Essentials contends Costco is not a C-store wholesaler, but is instead a "Club Store," with a unique sales channel that differentiates it from Plaintiffs. It is undisputed that, during the relevant time period, the CBCs offered both "cash and carry" service, as well as delivery service to customers within certain zip codes in an approximately 25-50-mile radius. Several of Plaintiffs' customers were located in zip codes to which Costco offered delivery.

Living Essentials sold 5-hour Energy to wholesalers in various configurations. Most wholesalers could purchase "master cases" containing 18 twelve-packs of a single flavor and strength, and "display racks" containing multi-flavored packages in both "regular strength" and "extra strength." Costco was limited to purchasing, by the pallet, "club packs" containing 24 bottles, in a limited selection of flavors. The list price for the master cases and display racks was $1.45/bottle for regular strength flavors and $1.60/bottle for extra strength, and the list price for club packs was $1.35/bottle for regular strength and $1.50/bottle for extra strength.

From these list prices, Living Essentials offered various discounts to both Plaintiffs and Costco. For example, Plaintiffs received for at least some of the limitations period a $0.07/bottle "everyday discount" off of the list price, and were offered (though on a limited basis) an additional $0.07/bottle "display allowance." On the flip side, Living Essentials gave Costco, but not Plaintiffs, a "business scan promotion" in the form of an instant rebate to Costco customers that ranged in value from $0.15/bottle to $0.30/bottle. And Living Essentials offered other promotional discounts to Costco, including a "fence program," where stores displayed 5-hour Energy as a promotional product along the fence at the front of the store, and "endcap promotions," where stores displayed the product at

the end of an aisle where it was more visible to customers. While there is no dispute that a given purchaser rarely paid the original list price, the parties dispute which discounts should be factored into Plaintiffs' and Costco's net prices for purposes of Plaintiffs' price discrimination claim, and whether the discounts were offered on fair and equal terms.

During this litigation, both sides submitted expert reports. Plaintiffs' expert, Dr. DeForest McDuff, generated a damages model that compares five hypothetical but-for prices, ranging from a weighted average of the favored and disfavored prices, to a hypothetical world in which Plaintiffs received a price identical to Costco's. The report's basis for inferring competition between Plaintiffs and Costco is the fact that some of Plaintiffs customers are located in a zip code to which CBCs offer delivery. *See* Dkt. No. 220-11 (McDuff Report).

For its part, Living Essentials submitted two expert reports. Dr. Darrell Williams rebutted Dr. McDuff's analysis largely in the context of class certification, criticizing Dr. McDuff's analysis of causality between Living Essentials' allegedly illegal conduct and Plaintiffs' harm, the scale at which competition allegedly occurred, and the commonality of impact on the plaintiffs. *See* Dkt. No. 179-11 (Williams Rebuttal Report). Dr. Glenn Woroch's report critiqued the methodology Dr. McDuff used to calculate net prices, arguing that many of the discounts Living Essentials offered should be excluded from price comparisons, and criticized the economic assumptions Dr. McDuff used to define a geographic market and infer competition between Plaintiffs and Costco. *See* Dkt. No. 221-1 (Woroch Report).

## B. Procedural History

ABC and a now-dismissed plaintiff originally filed this action against Living Essentials alleging violations of the California Unfair Competition Law ("UCL"), California Business & Professions Code § 17200, and "Unjust Enrichment / Quasi-Contract / Restitution." *See* Dkt. No. 1 (Compl.). The first and second amended complaints were filed as class-actions, adding named plaintiffs Elite and Ace, and adding additional claims under the Robinson-Patman Act ("RPA"), 15 U.S.C. §§ 13, 15, and the

California Unfair Practices Act, California Business & Professions Code § 17045.

Plaintiffs moved to certify two different classes. The first proposed class comprised any California wholesaler located within a zip code to which a Costco Business Center (CBC) offered delivery, and that purchased 5-hour Energy from Paramount during the limitations period and received a $0.07/bottle "Everyday Discount." *See* Dkt. No. 151 (Mot. Class Cert.). The second proposed class was defined identically to the first, minus the zip code limitation; it encompassed wholesalers in the entire state of California. *Id.* The Court denied class certification and denied Plaintiffs' request for reconsideration. Dkt. Nos. 192, 241. Plaintiffs submitted a petition the Ninth Circuit for permission to appeal the certification order, which was denied. Dkt. No. 281.

Defendants now move for summary judgment on all claims. Dkt. No. 218 (Defs.' Mot. Summ. J. ("D. Mot.")). Plaintiffs also move for summary judgment on all claims, except the damages portion of their claim under RPA § 2(a). Dkt. No. 224 (Pls.' Mot. Summ. J. ("P. Mot.")). Each party opposes the other's motion. Dkt. No. 244 (P. Opp.); Dkt. No. 254 (D. Opp.). All parties have consented to the jurisdiction of a magistrate judge. Dkt. Nos. 14, 15, 34.

## II. EVIDENTIARY ISSUES

Before moving to the merits, the Court addresses three evidentiary motions. Living Essentials moves to exclude the testimony of Dr. McDuff. Dkt. No. 219. Plaintiffs move to exclude the testimony of Dr. Woroch, Dkt. No. 229, and to exclude certain evidence related to Living Essentials' responses to interrogatories. Dkt. No. 228. The Court addresses the expert witnesses first, then the interrogatory-related evidence.

### A. *Daubert* Motions

Rule 702 of the Federal Rules of Evidence permits expert witness testimony "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." The Ninth Circuit has interpreted Rule 702 to require that such testimony "be both relevant and reliable." *Estate of Barabin v. AstenJohnson, Inc.*,

740 F.3d 457, 463 (9th Cir. 2014) (quoting *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001)).

Living Essentials' motion to exclude Dr. DeForest McDuff's expert opinon is DENIED. While the report uncompellingly assumes that geographic proximity equals competition, Dr. McDuff's testimony "logically advance[s] a material aspect" of Plaintiffs' case, *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007), by opining on economic impacts that could occur if his assumptions are true. And the testimony has "a reliable basis in the knowledge and experience of the relevant discipline," *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999), because Dr. McDuff's conclusions stem from his expertise in economic markets.

Plaintiffs' motion to exclude Dr. Woroch's expert opinion is also DENIED. Plaintiffs argue that Dr. Woroch's opinion is inadequately supported by facts and contradicts legal precedent regarding rebates and competition. However, the Court is persuaded that Dr. Woroch's opinion responds to facts in the record, and the Court is capable of determining for itself or a jury what the law is. The report otherwise satisfies the relevance and reliability requirements of Rule 702, so the report is admissible.

### B.  Motion to Exclude Evidence

Under Federal Rule of Civil Procedure 37(c), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Plaintiffs assert Living Essentials was required to, but did not, disclose certain evidence relevant to the parties' summary judgment motions, and it seeks sanctions excluding that evidence.

Plaintiffs' motion to exclude evidence is GRANTED in part and DENIED in part. First, Living Essentials' response to Interrogatory No. 7 does not preclude it from introducing evidence regarding functional discounts, because the interrogatory asked for information about price differences justified by Living Essentials' "cost of manufacture, sale, or delivery," i.e. a cost justification defense. Functional discounts like rebates or

United States District Court
Northern District of California

advertising promotions do not fall within the cost justification defense, so sanctions are not warranted here.  As it pertains to Interrogatory No. 7, the motion to exclude is DENIED.

Second, Plaintiffs' motion to exclude evidence related to Interrogatory No. 20 is GRANTED.  Living Essentials may not introduce evidence that it offered to sell 5-hour Energy to Plaintiffs at a lower list price than the list price at which it sold to Costco.  For purposes of this order, "list price" does not include rebates or discounts given as payment for services, like advertisements.  While the Court agrees with Plaintiffs that rebates must be factored into the net price for purposes of RPA § 2(a), *see Fred Meyer, Inc. v. F.T.C.*, 359 F.2d 351, 362 (9th Cir. 1966), Living Essentials claims to have believed in good faith that rebates and certain other discounts are external to a "list price."  The Court cannot say that Living Essentials clearly did not believe this in good faith, so its non-substantive response to a question about Costco's list price does not warrant sanctions.[1]  Thus, Living Essentials is barred only from introducing evidence that Plaintiffs' list price, as defined above, was lower than Costco's.

The third and final set of disputed evidence relates to net pricing and Plaintiffs' Interrogatory No. 21.  Plaintiffs argue that Living Essentials' non-substantive response warrants sanctions barring evidence that Plaintiffs were charged a net price equal to or lower than the net price charged to Costco.  Living Essentials argues that its response to Interrogatory No. 10, dated October 14, 2016, directed Plaintiffs to already-disclosed documents[2] that, according to Living Essentials, allowed Plaintiffs to deduce Costco's net price.  These same documents, according to Living Essentials and Dr. Woroch's expert report, include the specific evidentiary claim Plaintiffs seek to exclude: that Living Essentials gave retailers buying 5-hour Energy from Plaintiffs a rebate of $0.07 per bottle and offered them a "2 for $5" promotion.  *See* Mot to Excl. at 14.

---

[1] The Court also declines Plaintiffs' invitation to impose monetary sanctions on Living Essentials for its denial of Plaintiffs' Request for Admission No. 10.  The parties have obviously disagreed on the meaning of list price versus net price, and the dispute over Request for Admission No. 10 appears to stem from that disagreement, not bad faith.
[2] These are "bate stamped documents LE-PIT001229-3820, 8833-8854, 8242, 8243 – 8247, 8248, 8935, 9081, and 9109 –9116."  Dkt. No. 257-8.

However, Living Essentials did not submit these documents with any filing, so the Court cannot determine whether the documents say what Living Essentials claims they do, or whether, as Plaintiffs claim, they do not speak to net pricing. Thus, the Court rules as follows: Living Essentials may not use or introduce evidence that it gave Plaintiffs' customers a $0.07 per bottle rebate or offered a 2-for-$5 deal, beyond what is contained in the bate stamped documents it cited to in its October 14, 2016, response to Interrogatory 10. Because those documents are not before the Court at this time, the Court will not consider the evidentiary claim on the specific figures above for summary judgment purposes.

With the evidentiary issues resolved, the Court turns to the merits.

## III. LEGAL STANDARD

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the nonmoving party, there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Bald assertions that genuine issues of material fact exist are insufficient. *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).

The moving party bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings, and, by its own affidavits or discovery, set forth specific facts showing that a genuine issue of fact exists for trial. Fed. R. Civ. P. 56(c); *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1004 (9th Cir. 1990) (citing *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)). All justifiable inferences, however, must be drawn in the light most favorable to the nonmoving party. *Tolan*, 134 S. Ct. at

1863 (citing *Liberty Lobby*, 477 U.S. at 255).

## IV. DISCUSSION

Plaintiffs claim Living Essentials violated (1) the RPA § 2(a); (2) the RPA § 2(d); (3) California Business and Professions Code § 17045; (4) California's Unfair Competition Law ("UCL"), California Business and Professions Code § 17200; and (5) benefitted from unjust enrichment. The Court considers each in turn.

### A. Robinson-Patman Act § 2(a)

The RPA prohibits "any person engaged in commerce" from "discriminat[ing] in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially to lessen competition . . ." 15 U.S.C. § 13(a). Section 2(a) "does not ban all price differences charged to different purchasers of commodities of like grade and quality; rather the Act proscribes price discrimination only to the extent that it threatens to injure competition." *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMG, Inc.*, 546 U.S. 164, 177 (2006).

A plaintiff seeking injunctive relief under § 2(a) need only prove that "competitive injury *may* result." *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1042 (9th Cir. 1987) (emphasis in original). Where, as here, a plaintiff seeks damages, the plaintiff must also show "antitrust injury," which requires "some showing of actual injury and causation." *Id.* at 1041.

Both parties moved for summary judgment on competitive injury, and Living Essentials moved for summary judgment on antitrust injury.

#### 1. Competitive Injury Is Factually Disputed.

Here, Plaintiffs are wholesalers and Living Essentials manufactures 5-hour Energy. Thus, Plaintiffs bring a "secondary-line" case, alleging that the manufacturer discriminates in pricing when selling to its customers, the wholesalers. *See Volvo*, 546 U.S. at 176 (2006).

To establish secondary-line competitive injury, Plaintiffs must prove that (1) the relevant 5-hour Energy sales were made in interstate commerce; (2) the 5-hour Energy

sold to favored and disfavored customers is of "like grade and quality"; (3) Living Essentials "discriminated in price between" Plaintiffs and a favored purchaser of 5-hour Energy; and (4) "the effect of such discrimination may be . . . to injure, destroy, or prevent competition," to the advantage of the favored purchaser. *Id.*; 15 U.S.C. § 13(a).

### a. The First Three Elements Are Factually Undisputed.

The parties do not dispute that the first three elements of competitive injury are satisfied. First, Living Essentials admits it sold 5-hour Energy to Plaintiffs in interstate commerce during the relevant time period. Dkt. No. 222-43 at 4 (Poe Decl. Ex. 27). Second, Living Essentials does not contest that the 5-hour Energy it sold to Costco and Plaintiffs was of like grade and quality. *See* D. Mot. at 5–19; D. Opp. at 3–12.

Third, "price discrimination within the meaning of [the third element] is merely a price difference." *F.T.C. v. Anheuser-Busch, Inc.*, 363 U.S. 536, 549 (1960) (explaining that determining whether a price difference constitutes illegal discrimination should be cabined to the fourth element's harm-to-competition framework). The undisputed evidence shows Costco received a discount, relative to Plaintiffs, of at least "about three percent of the wholesale price," according to Living Essentials' expert. Dkt. No. 222-28 (Poe Decl., Ex. 13 (Woroch Dep. 18:13-14)) ("As a rough average, [the price difference is] about three percent of the wholesale price."). Living Essentials argues that the price differences were justified and not cognizable under the RPA,[3] but it does not deny—and indeed, its experts found—that Costco received a lower price than Plaintiffs for at least some of the time period encompassing Plaintiffs' claims. This undisputed price difference satisfies the third element.

### b. The Fourth Element Is Factually Disputed.

The fourth element—competitive injury—is the crux of an RPA § 2(a) claim. As a threshold issue, there must be evidence that a favored and disfavored purchaser actually

---

[3] Living Essentials offers additional argument and evidence that the price difference is justified and/or de minimus in its *Morton Salt* inference discussion. That is the correct part of the analysis to discuss those arguments, so the Court also addresses them there as well.

competed with each other during the period of alleged price discrimination, otherwise there is no competition to injury. *Volvo*, 546 U.S. at 177. Once actual competition is established, competitive injury may be shown in either of two ways. The first option is by direct evidence of diverted sales or profits from a disfavored purchaser to a favored purchaser—the "hallmark of the requisite competitive injury." *Id.* (citing *FTC v. Sun Oil Co.*, 371 U.S. 505, 518–19 (1963). The second option is known as a *Morton Salt* inference, showing that a favored competitor received "a significant price reduction over a substantial period of time." *Volvo*, 546 U.S. at 177.

Here, Plaintiffs do not attempt to show competitive injury through direct evidence of diverted sales or profits, instead relying purely on *Morton Salt*. *See* P. Mot. at 13–20; P. Opp. at 5–13; P Reply at 4–6. Plaintiffs also makes a generalized argument that "the contemporaneous evidence uniformly recognizes that the favoritism of the chain of Costco Business Centers was harmful (let alone "may" have been harmful) to the non-chain wholesalers in California." P. Mot. at 14.

The Court first addresses the threshold issue of whether there was actual competition between Plaintiffs and Costco, and then addresses Plaintiffs' *Morton Salt* argument.

### i. The Existence of Actual Competition Is Factually Disputed.

A necessary part of showing competitive injury is establishing that competition exists in the first place. *Volvo*, 546 U.S. at 177 ("Absent actual competition with a favored Volvo dealer, however, Reeder cannot establish the competitive injury required under the Act."). If Plaintiffs showed competitive injury with evidence of diverted sales or profits, the existence of competition would be unquestioned; by their nature, diverted sales show competition for customers. When relying on a *Morton Salt* inference, though, it must be eminently clear that the favored and disfavored purchasers are in actual competition, because competition would not typically be harmed if non-competing purchasers received different prices for the same goods. *See id.* at 179.

Plaintiffs attempt to establish actual competition by showing that Plaintiffs and

Costco occupy the same place in the supply chain and sell into a common geographic market. P. Mot. at 17–18. This is sufficient to establish competition, Plaintiffs claim, because "[t]he only standard that has been articulated by federal courts for determining whether two secondary-line purchasers are in 'actual competition' asks only whether there is a 'competitive nexus' between them." P. Mot. at 17 (quoting *Best Brands Beverage, Inc. v. Falstaff Brewing Co.,* 842 F.2d 578, 584-85 (2d Cir. 1987)). Plaintiffs argue the Ninth Circuit adopted the same "competitive contact" test for competition in *Tri-Valley Packing Ass'n v. FTC*, 329 F.2d 694 (9th Cir. 1964), and they further rely on *Falls City Ind. v. Vanco Beverage, Inc.,* 460 U.S. 428, 433 (1983) to argue that direct proof of competition for the same retail customer is not necessary. P. Mot. at 18–19.

Plaintiffs' reliance on *Best Brands*, *Tri-Valley*, and *Falls City* is misguided for several reasons. In *Best Brands*, the Second Circuit explained that a "competitive nexus" is a "*basic predicate* of any conclusion of adverse effects," and that demonstrating "competitive contact" satisfied the "competitive nexus" requirement. 842 F.2d at 584–85 (emphasis in original). But the court ultimately concluded that the defendant manufacturer was entitled to a directed verdict when "no evidence was presented suggesting that [the disfavored purchaser, favored purchaser], or their customers, made purchases in the other's territory, or otherwise competed therein." *Id.* at 585. It is true that the court focused on geography, but it nonetheless demanded specific evidence of competition for sales.

In both *Tri-Valley* and *Falls City*, the respective courts acknowledged that the requisite competition could be between purchasers' customers, rather than between the purchasers themselves, but neither case obviates the need for evidence of competition somewhere in the supply chain. *See Tri-Valley*, 329 F.2d at 697–98; *Falls City*, 460 U.S. at 434.[4] And although the court in *Tri-Valley* found it appropriate to "assume that . . . customers who are in functional competition in the same geographic area . . . are in actual

_____

[4] Furthermore, the Court in *Falls City* found there was direct evidence of diverted sales from the disfavored purchaser's customers to the favored purchaser's customers, which "more than established the competitive injury required for a prima facie case under § 2(a)." *Falls City*, 460 U.S. at 437–38. Plaintiffs offer no evidence of diverted sales here.

competition with one another," it did so in the context of an RPA § 2(d) claim, not for determining competitive injury under RPA § 2(a). *See Tri-Valley*, 329 F.2d at 708–09.

The Supreme Court's decision in *Volvo*—which postdates *Best Brands*, *Tri-Valley*, and *Falls City*—confirms that a common position in the supply chain in a shared geographical market is insufficient to show actual competition. There, car dealerships in a common geographical region would solicit prices from the manufacturer Volvo to generate a bid price for a specific retail customer, based on that customer's particular needs. The Supreme Court granted certiorari in *Volvo* for the express purpose of clarifying that a manufacturer may not be held liable for price discrimination, "absent a showing that the manufacturer discriminated between dealers contemporaneously competing to resell to the same retail customer." *Volvo*, 546 U.S. at 169. The Court noted that competition for an opportunity to bid for sales was "based on a variety of factors, including the existence vel non of a relationship between the potential bidder and the customer, geography, and reputation." *Id.* at 179. Consequently, the fact that "Volvo dealers may bid for sales in the same geographic area does not import that they in fact competed for the same customer-tailored sales." *Id.*

In all fairness to Plaintiffs' position, the Court in *Volvo* was highly cognizant of the uniqueness of the market at issue there. This caused the Court to reason that "the chainstore paradigm" likely would not run the same risk of a plaintiff using manipulative sales comparisons to falsely show competitive injury. *Id.* at 178. But that observation does not diminish the Court's fundamental holding and key concern. Instead, *Volvo*'s unique facts conveniently illustrate how two purchasers can occupy the same place in a supply chain, in a common geographical market, and still not compete with each other for the same customers. In light of that possibility, the Supreme Court held that competition may not be inferred under *Morton Salt* without evidence that a favored and disfavored purchaser actually compete for sales to the same customer.

Logically, this holding simply reflects what is implicitly obvious: there can be no injury to competition unless there is actual competition to be injured. Because geographic

proximity does not necessarily mean purchasers compete for sales, proof of their competition is necessary to infer competitive injury. *Accord, e.g., Feesers, Inc. v. Michael Foods, Inc.*, 591 F.3d 191, 203 (3d Cir. 2010) (analyzing *Volvo* and concluding that "two parties are in competition only where, after a careful analysis of each party's customers, we determine that the parties are each directly after the same dollar") (internal citations omitted).[5]

Thus, Plaintiffs' § 2(a) claim requires evidence that Plaintiffs actually competed with Costco for customers.[6] Dr. McDuff's report does not satisfy this basic requirement, because it assumes the existence of competition based on the fact that some of Plaintiffs' customers are located in zip codes to which Costco offers delivery, rather than evaluating, for example, "each party's customers" and determining that "the parties are each directly after the same dollar." *Id.* The only evidence of actual competition between Plaintiffs and Costco are deposition testimony and email communications between certain Paramount and Living Essentials employees, plus one possible (but disputed) example of a diverted sale.

The deposition evidence includes testimony that certain of Plaintiffs' customers may shop at Costco. *See* Dkt. No. 227-16 (Poe Decl. Ex. 16 (Mousa Rahib Dep. 47:10-48:20)) (speculating that customers who do not buy 5-hour Energy from ABC are "probably buying it from Costco or somebody that has a much, much better price"); Dkt. No. 227-10 (Poe Decl. Ex. 10 (Lee Tr. 105:10-107:13, 122:24-123:6)). Living Essentials' expert also acknowledged that ABC's and Elite's "customer segments"—in terms of the general type of retailer (e.g. "mom and pop non-chain convenience stores")—overlap with

---

[5] At least one of the cases Plaintiffs cite to argue *Volvo* does not require evidence of actual competition, *JOC Inc. v. ExxonMobil Oil Corp.*, No. CV 08-5344 (SRC), 2013 WL 12159044, at *15 (D.N.J. Jan. 22, 2013), cites *Feesers*. The Court's reading of the law is not revolutionary as Plaintiffs claim.
[6] The competition could be farther down the distributor-to-consumer chain, as long as it could be injured by the alleged discriminatory pricing. *See Falls City*, 460 U.S. at 436 ("[T]he competitive injury component of a Robinson-Patman Act violation is not limited to the injury to competition between the favored and the disfavored purchaser; it also encompasses the injury to competition between their customers.").

Costco. Dkt. No. 227-13 (Poe Decl. Ex. 13 (Woroch Dep. 87:9-13)).

Other emails and statements by Paramount and Living Essentials employees suggest that wholesalers in California may have competed with Costco. These statements assert that some of Paramount's wholesale customers in California either bought less 5-hour Energy from Paramount or sold less 5-hour Energy to their own retail customers when Costco received promotional pricing from Living Essentials. *See* P. Mot. at 10–13. And certain of these emails identify ABC and Elite as being among the wholesalers who might have competed with Costco for 5-hour Energy sales. *See* Dkt. No. 227-25 (Poe Decl. Ex. 25 at 1 (listing Elite as one of the "wholesalers that cater to jobbers and independent retailers, the same group that Costco Business Center and Sams sell to.") and at 3 (listing ABC on a chart of customers, stating: "These customers directly compete with Costco Business Centers.")).

Finally, Plaintiffs point to one of ABC's former customers, El Cajon Cash 'n Carry, as a possible diverted sale. *See* P. Opp. at 15. Allegedly, El Cajon's owner "would always buy his 5-hour Energy from [ABC]," but stated he could buy 5-hour Energy cheaper from Costco, and then did so on one occasion. P. Opp. at 15; Poe Decl. Ex. 4 (Rahib Dep. 86:20-87:10, 99:19-110:6; 188:5-188:23). In sum, Plaintiffs assert that "there is no document or contemporaneous statement suggesting that Plaintiffs are not competitors of the CBCs for sales of 5-hour Energy." P. Mot. at 16.

Living Essentials disputes the sufficiency of the evidence described above, and it asserts actual competition cannot be shown because "Plaintiffs and Costco are differentiated by many factors, including by their product prices, product mix, product package amounts, store location, store hours, and special services they provide (like delivery or in-house credit)." D. Mot. at 9 (citing Dkt. No. 220 (Hawxhurst Decl. Ex. A (Lee Dep.), Ex. B (Rahib Dep.), Ex. J (Fell Dep.)) and Dkt. No. 221 (Woroch Dep.)). These differences, Living Essentials argues, raise the possibility that Plaintiffs and Costco sell within distinct markets to different customers, and do not actually compete. Living Essentials also contends that El Cajon does not represent a diverted sale, because El Cajon

made its 5-hour Energy purchase from a Costco store in San Diego, not in Los Angeles where Plaintiffs operate, and did so after this litigation started.  D. Opp. at 7.

After evaluating the evidence, the Court finds there is a genuine factual dispute whether Plaintiffs actually competed with Costco for 5-hour Energy sales during the limitations period.  Plaintiffs' evidence establishes that certain of Living Essentials' and Paramount's employees believed that Plaintiffs competed with the Costco chain for 5-hour Energy sales, and it implies a link between Living Essentials' promotional pricing to Costco and other wholesalers' reduced sales.  But this largely circumstantial evidence does not definitively show that Plaintiffs and Costco actually competed for 5-hour Energy sales to the same retail customers.  Beyond this insufficiency, Living Essentials' evidence shows Plaintiffs' and Costco's differentiated business models may have targeted different customers, allowing non-competing economic niches within the same geographic market.

Because this threshold component of competitive injury is disputed, Plaintiffs' motion for summary judgment is DENIED as to their RPA § 2(a) claim, including on damages for antitrust injury.  The Court next considers Living Essentials' motion for summary judgment on the *Morton Salt* argument.

### ii.  Disputed Material Facts Preclude a *Morton Salt* Inference.

As stated above, establishing the requisite competitive injury through a *Morton Salt* inference requires a plaintiff to show that a favored competitor received "a significant price reduction over a substantial period of time."  *Volvo*, 546 U.S. at 177.  Here, the parties dispute the significance of the price reduction Costco received relative to Plaintiffs, so summary judgment is not appropriate.

Living Essentials puts forth two lines of argument against applying a *Morton Salt* inference here.  First, it argues that, "[a]fter correcting Dr. McDuff's faulty consideration of the evidence and inaccurate calculations, Dr. Woroch demonstrates that the differences in the prices paid by Plaintiffs and by Costco were, in fact, negligible."  D. Mot. at 11. Specifically, Dr. Woroch opines that Dr. McDuff erred by excluding certain discounts from Costco's net price, including promotional payments made to Costco on a national,

rather than regional basis; instant rebate coupons that Living Essentials provided to Costco's customers; a double-counted spoilage allowance; and advertising promotions that Living Essentials claims are not tied to the sale of the product.  *See* Dkt. No. 221-1 (Woroch Decl. Ex. A (Woroch Merits Report)).

Living Essentials especially focuses on advertisements.  It asserts that its promotions with Costco, including a "fence program" and "end-cap" promotions, are functional discounts given for "legitimate marketing services by Costco," which Plaintiffs are not in a position to offer.  D. Mot. at 12 (citing Hawxhurst Decl. Ex. F (Meguiar Dep. 43:22-44:7; 48:3-48:16; 78:3-78:12; 73:16-74:4.)).  With the allegedly improper exclusions accounted for, Living Essentials contends the average per-bottle price difference for both regular strength and extra strength was "under four cents, significantly less than the inflated differential Dr. McDuff calculated of between eleven and thirty-one cents."  D. Mot. at 12.

Second, Living Essentials argues that if there is reason to apply a *Morton Salt* inference, "the absence of any evidence of substantial harm to competition" defeats the inference.  D. Mot. at 13.  Arguing that "courts cannot evaluate competitive injury in a vacuum," Living Essentials points out that the absence of diverted sales is a "powerful indication that price discrimination did not harm competition."  D. Mot. at 13 (quoting *Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202, 214 (2d Cir. 2015)).

Plaintiffs respond that rebates must be included in determining the net price as a matter of law, and that the disputed advertising promotions are not functional discounts.  P. Mot. at 9–10; P. Opp. at 12–13.  Even if rebates and advertising payments are excluded, Plaintiffs argue, "all of the experts and all of the contemporaneous evidence" still show that there was "significant discrimination in Costco's favor," for the entire limitations period.  P. Mot. at 14.  This is true, Plaintiffs assert, because the differential pricing occurred in a "marketplace where—according to the Living Essentials' employee tasked with managing this marketplace—'for a penny wholesalers and retailers would go somewhere else and buy it if they get a penny cheaper."  P. Mot. at 8. (quoting Poe Decl.,

Ex. 11 (Eaves Dep. 42:25-44:2)).  According to Plaintiffs, these narrow profit margins

would make even the small price difference in Dr. Woroch's report actionable.

Plaintiffs are correct that all three of the expert reports show some level of price

reduction favoring Costco over ABC and Elite, over most or all of the limitations period.

The disagreement, then, is whether the price differences are substantial enough to be

cognizable under § 2(a), which in turn depends on which discounts factor into the actual

net price.  The Court addresses functional discounts, rebates, and advertising promotional

services.

First, it is not clear that the discounts Living Essentials gave to Costco can be

considered functional discounts, because Plaintiffs and Costco occupy overlapping but not

necessarily identical places in the supply chain.  "A functional discount is one given to a

purchaser based on its role in the supplier's distributive system, reflecting, at least in a

generalized sense, the services performed by the purchaser for the supplier."  *Texaco Inc.*

*v. Hasbrouck*, 496 U.S. 543, 554–555, n.11 (1990) (explaining that wholesalers provide

benefits like absorbing "the risks and costs involved" in storing and distributing goods).

Here, Living Essentials asserts that its advertising promotions with Costco reflect

Costco's value in the distributive system.  It argues the fence program and end-cap

promotion were for "legitimate marketing services by Costco that provide unique value to

Living Essentials," and that Plaintiffs are "not in a position to offer similar value to Living

Essentials through these promotions."  D. Mot. at 12.  This difference stems from Costco's

position as a "Club Store," rather than "C-store wholesaler," meaning it uses a different

sales channel with different product configurations.  D. Opp. at n.9.  Plaintiffs respond that

Plaintiffs and Costco both operate as C-store wholesalers, meaning the functional discount

concept does not apply.  P. Opp. at 4.  Thus, there is a factual dispute over the extent to

which Costco provides functional benefits to Living Essentials, relative to Plaintiffs,

because of some allegedly unique role in the supply chain.

The dispute over Costco's functional value to Living Essentials is sufficient

grounds to deny Living Essentials' summary judgment motion.  For clarity, though, the

1  Court also considers whether Living Essentials' rebates and advertising promotional

2  payments should be analyzed as part of Costco's net price under § 2(a) or as a payment for

3  services under § 2(d).

4      Plaintiffs argue that rebates are "outright price concessions" and are "cognizable

5  under section 2(a)" when the manufacturer's payments to a favored customer are "directly

6  related to and dependent upon the amount of goods purchased and resold." P. Mot. at 10

7  (quoting *Fred Meyer*, 359 F.2d at 362, reversed in part on other grounds, *F.T.C. v. Fred*

8  *Meyer, Inc.*, 390 U.S. 341 (1968)). *Fred Meyer* involved coupon books, where suppliers

9  bought pages in the books for their promotional value, providing payment in cash,

10 discounted goods, and reimbursement or replacement for goods redeemed by coupon. The

11 court held that the actual promotional value of the coupon pages was not cognizable under

12 § 2(a), but the remainder of the substantial discounts granted to the favored purchaser was

13 actionable. *Id.* (explaining that the payments received need not precisely equal the

14 promotional services rendered, but the relationship between them "cannot be

15 unreasonable").

16     The Court agrees with Plaintiffs that the rebates Living Essentials offered to Costco

17 or Costco's customers are cognizable under § 2(a). Living Essentials does not argue that

18 the rebates Dr. McDuff and Dr. Woroch discuss were for a promotional service tied to the

19 rebates; instead it argues that the rebates do not factor into net price because they were

20 "fully passed through" to the customers. D. Mot. at 11. Most or all of the value of the

21 coupon books in *Fred Meyer* were also passed through to the favored purchaser's

22 customers, but that did not free them of the RPA's reach. *See Fred Meyer,* 359 F.2d at

23 362; *accord Mathew Enter., Inc. v. Chrysler Grp. LLC*, No. 13-cv-04236-BLF, 2015 WL

24 3664843, at *3 (N.D. Cal. Jan. 12, 2015) ("Price, for purposes of the RPA, refers to the net

25 amount paid by the buyer, *taking into account any rebates* or discounts also provided to

26 that buyer by the seller.") (emphasis added). Because the rebates here are not payment for

27 a promotional or other service, they must be included as part of Costco's net price in

28 determining the substantiality of Costco's price advantage over Plaintiffs.

A similar analysis applies to the advertising promotional payments. Living Essentials' payments to Costco for advertising services are cognizable under § 2(a) to the extent they exceed the actual promotional value of the advertisements Costco provided. To the extent they were proportional to the actual value of Costco's advertising service, that exchange must be analyzed under § 2(d) to determine whether the same promotion was made available to Plaintiffs on proportionally equal terms. *See American Booksellers Ass'n v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1065–68 (N.D. Cal. 2001) ("Accordingly, to the extent the promotional allowances received by defendants do not bear a reasonable relationship to their actual advertising expenditures, the Court agrees with plaintiffs that they can be challenged as indirect price discrimination under § 2(a).").

Thus, a jury must determine the degree to which the advertising-related discounts exceed their true promotional value to Living Essentials. Once a definitive cognizable discount is established, it is still a factual question whether that difference is significant or de minimis. *See Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1428 n.20 (11th Cir. 1990) ("[T]he *de minimis* doctrine . . . does not depend on the large or small amount of the price discrimination *per se*. It depends on the large or small effect that the price discrimination has on business rivalry."); *accord Mathew Enter., Inc. v. Chrysler Grp. LLC*, No. 13-CV-04236-BLF, 2016 WL 4269998, at *7 (N.D. Cal. Aug. 15, 2016) (holding that the effect of disputed price discrimination must be determined by a jury).

Because there are genuine disputes of material fact regarding the extent and nature of the price advantage Costco enjoyed relative to Plaintiffs, Living Essentials' motion for summary judgment on competitive injury under § 2(a) is DENIED.

## 2. Antitrust Injury Is Disputed.

Under the RPA, only "a person who *shall be* injured in his business or property" may recover damages. 15 U.S.C. § 15. To satisfy this requirement, Plaintiffs must prove "antitrust injury," which requires "some showing of actual injury and causation." *Hasbrouck*, 842 F.2d at 1041. Importantly, the causation requirement means Plaintiffs' harm must arise specifically because of the advantage Costco received, not simply because

Plaintiffs were charged more than a hypothetical lower price. *See Volvo*, 546 U.S. at 176–77 (explaining that the injury must be "to the advantage of a favored purchaser, i.e., one who "receive[d] the benefit of such discrimination") (quoting 15 U.S.C. § 13(a)).

There is a "traditional rule excusing antitrust plaintiffs from an unduly rigorous standard of proving antitrust injury." *J. Truett Payne Co. v. Chrysler Motor Corp.*, 451 U.S. 557, 565. The lower standard exists because antitrust injury only comes into play once a plaintiff has already established competitive injury, and courts seek to avoid "the inequity of a *wrongdoer* defeating recovery of damages against him by insisting upon a rigorous standard of proof." *Id.* at 568 (emphasis in original). So, if competitive injury has been shown, and if the alleged injury is "precisely the type of loss that the claimed violations of the antitrust laws would be likely to cause," then a lower standard applies. *Hasbrouk*, 842 F.2d at 1042.

Given the relaxed standard for proof of antitrust injury that will apply if Plaintiffs prove competitive injury at trial, Plaintiffs need only circumstantial evidence of causation between the harm they claim and Costco's alleged advantage in order to defeat Living Essentials' summary judgment motion on antitrust injury. *See Mathew Enterprise*, 2016 WL 4269998, at *9–10 (finding circumstantial evidence of causation sufficient to survive summary judgment).

The evidence Plaintiffs rely on to show antitrust injury largely mirrors the evidence presented to show actual competition: statements by Paramount and Living Essentials employees, plus the disputed example of El Cajon Cash 'n Carry as a possible diverted sale. Those statements include, for example, an August 2012 email from Clark Eaves to Steve Ramsey that Costco was selling 5-hour Energy "at $1.32 per bottle on Regular Strength. . . [which] drives retailers to the business centers where they are able to stock up on each of the flavors at a big saves vs what they pay from a wholesaler. At a minimum this is a $0.18 per bottle savings." Dkt. No. 227-41 (Poe Decl. Ex. 44). A similar email by Living Essentials employee Vince Sullivan on June 10, 2015, stated that wholesalers including ABC "have seen sales plummet as Costco runs 5-hour at $1.31 Reg Strength and

$1.42 on Extra-Strength a few times per year," and that Costco Business Center sales were up 64% year-to-date, while Elite's sales were down 8% (by number of bottles sold). Dkt. No. 227-25 (Poe Decl. Ex. 25 at 1, 3). Plaintiffs cite several other statements by Paramount and Living Essentials' employees that reflect, in general terms, their opinion that Costco's pricing negatively affected either wholesalers' sales in California, or Paramount's sales to those wholesalers. *See* P. Mot. at 10–13; P. Opp. at 14–15.

Plaintiffs also present El Cajon as an example of a diverted sale. As described in the context of actual competition, El Cajon's owner regularly bought 5-hour Energy from ABC, but stated he could purchase it more cheaply from Costco and later bought a pallet of it from a San Diego Costco, after this action was filed. Dkt. No. 227-4 (Poe Decl. Ex. 4).

In response, Living Essentials points out that Mr. Sullivan, Mr. Eaves, and Paramount employee Kevin Riffle "had a direct interest in the sale of 5-hour ENERGY® to wholesalers in California (including the Plaintiffs) and had no knowledge about Living Essentials' other customers, sales channels, or pricing (including, most importantly, Costco)." D. Opp. at 8. Living Essentials also asserts El Cajon cannot be considered a diverted sale indicative of antitrust injury, because the diversion was to a Costco in San Diego and occurred after this litigation began. In its motion for summary judgment, Living Essentials also attacks Dr. McDuff's report as a basis for showing antitrust injury, arguing it measures "lost sales and profits" due to "artificially higher prices," "rather than lost sales and profits due to price discrimination between competitors." D. Mot. at 16 (citing Hawxhurst Decl. Ex. K (McDuff Merits Report at 33)).

Applying the relaxed standard of proof, the Court finds Plaintiffs have presented sufficient evidence to make antitrust injury a triable issue of fact. The Court agrees with Living Essentials that Dr. McDuff's report does not evince antitrust injury, but Plaintiffs are also correct that the report is more appropriately viewed as a damages calculation that applies if and when antitrust injury is established. The remaining evidence is largely circumstantial and merely reflects various employees' opinions about economic harm to

Plaintiffs, but it is sufficient under the relaxed standard of proof to defeat Living Essentials' motion for summary judgment on the issue. *See Mathew Enterprise,* 2016 WL 4269998, at *10. Accordingly, Living Essentials' motion for summary judgment on antitrust injury under Plaintiffs' § 2(a) claim is DENIED.

## B.  Robinson-Patman Act § 2(d)

Section 2(d) exists to "strengthen the prohibition against unfair price discrimination by prohibiting price discrimination disguised in the form of advertising or promotional services." *Purdy Mobile Homes, Inc. v. Champion Home Builders Co.*, 594 F.2d 1313, 1317 (9th Cir. 1979). This section "requires those who grant to some of their costumers allowances in connection with the sale of commodities in commerce to make such allowances 'available on proportionately equal terms to all other customers.'" *FTC v. Hunt Foods & Indus., Inc.*, 178 F. Supp. 448, 455 n.19 (S.D. Cal. 1959) (quoting 15 U.S.C. § 13(d)). The services or facilities covered by Section 13(d) must be "[i]n connection with the resale (not the initial sale between the seller and the customer) of the seller's products." 16 C.F.R. § 240.2(a).

To prevail on their § 2(d) claim, Plaintiffs must show that (1) Costco and Plaintiffs compete with each other in the distribution of 5-hour Energy; (2) Living Essentials paid or provided a benefit to Costco as compensation for promotional services in selling 5-hour Energy, (3) and Living Essentials failed to offer the promotional benefit to Plaintiffs on proportionally equal terms. *See Tri-Valley Packing*, 329 F.2d at 707–08.

Plaintiffs identify two potential violations of § 2(d): the instant rebates offered to Costco customers, and Living Essentials' payments to Costco for advertising (e.g., the end-cap and fence promotions). Neither promotion was offered to them, Plaintiffs allege, let alone on proportionally equal terms. P. Mot. at 21–22. In response, Living Essentials argues that Plaintiffs have not identified a service for which the rebates were given, thus foreclosing § 2(d) liability; and it argues that the Plaintiffs conflate their § 2(a) and § 2(d) claim regarding the advertisements.

Regarding the first potential violation, the Court agrees with Living Essentials that

Plaintiffs have failed to identify any service for which the rebates were allegedly offered. Consequently (and as discussed in the § 2(a) analysis), Plaintiffs are correct that the rebates properly must be considered part of Costco's net price; but Living Essentials is correct that they do not give rise to a § 2(d) claim.

The second alleged violation—the advertising promotions—is factually disputed, because it is not clear whether Plaintiffs and Costco are in competition for purposes of § 2(d). As noted in the analysis of actual competition for § 2(a), there is precedent to infer competition based on shared supply chain position in a common geographic market for a § 2(d) claim. *See Tri-Valley*, 329 F.2d at 708–09. However, the inference is limited to purchasers that are "operating *solely* on a particular functional level such as wholesaling or retailing." *Id.* (emphasis added).

Here, Living Essentials asserts that Costco and Plaintiffs occupied at least slightly different roles in the supply chain and because of that, differed in their respective abilities to offer advertising services. The Court's earlier analysis regarding functional discounts speaks directly to the arguments here. Living Essentials asserts that its advertising promotions with Costco reflect Costco's unique value in the distributive system, and that Plaintiffs were not in a position to provide similar services. Plaintiffs respond that Plaintiffs and Costco both operate purely as wholesalers, meaning they were in actual competition such that Plaintiffs were entitled to the same promotional discounts. As with functional discounts under competitive injury, there is a factual dispute over the precise role Costco occupied in the supply chain and the extent to which Costco allegedly unique role provides Living Essentials with marginal value relative to Plaintiffs. Thus, competition cannot be inferred based on identical supply chain positions in a common geographic market, because the purchasers' supply chain positions are disputed. In light of this factual dispute, both parties' motions for summary judgment on § 2(d) are DENIED.

## C. State Law Claims

Plaintiffs bring three state law claims, alleging violation of California Business and Professions Code § 17045; violation of California's Unfair Competition Law (UCL); and

unjust enrichment. Each of these claims hinges on their RPA claims, and the same disputed facts bar summary judgment here.

First, Section 17045 prohibits sellers from giving secret discounts to certain purchasers when the discount "injures a competitor and tends to destroy competition." Cal. Bus. & Prof. Code § 17045; *see also ABC Int'l Traders, Inc. v. Matsushita Elec. Corp. of Am.*, 14 Cal. 4th 1247, 1256 (1997). This proscription mirrors the RPA's antitrust injury and competitive injury elements. *See Am. Booksellers*, 135 F. Supp. 2d at 1043 (granting summary judgment on a § 17045 claim based on the outcome of the parallel RPA claim). Thus, the Court rules on this claim equivalently to its ruling on the RPA claims. Both parties' motions are DENIED.

Both parties agree that Plaintiffs' UCL and unjust enrichment claims depend on RPA liability. *See* D. Mot. at 23–24; P. Opp. at 25. So does the Court. Both parties' motions for summary judgment on these claims are DENIED.

## V.   CONCLUSION

Because numerous material facts are genuinely disputed based on the evidence on record, both parties' motions for summary judgment are DENIED.


**IT IS SO ORDERED.**


Dated:  September 1, 2017                    _____
                                            NATHANAEL M. COUSINS
                                            United States Magistrate Judge